**STATE INDUSTRIES, INC., Appellee,**

v.

**A.O. SMITH CORPORATION, Appellant.**

**Appeal No. 84–590.**

United States Court of Appeals, Federal Circuit.

Jan. 3, 1985.

---

Glenn O. Starke, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., argued, for appellant. With him on the brief was Gary A. Essmann, Milwaukee, Wis.

Paul R. Puerner, Michael, Best & Friedrick, Milwaukee, Wis., argued, for appellee. With him on the brief was Glenn A. Buse, Milwaukee, Wis.

Before RICH, BALDWIN and KASHIWA, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the October 5, 1983, Order of the United States District Court for the Middle District of Tennessee, Nashville Division, 221 USPQ 958 (1983). The court, sitting without a jury, held appellee's Lindahl patent No. 4,263,879 ('879), issued April 28, 1981, for "Water Heater," valid and willfully infringed. We affirm the holdings of validity and infringement, and reverse the holding that infringement was willful.

## Background

State Industries, Inc. (State), which manufactures and sells industrial water heaters under its SANDBLASTER mark, sued its competitor A.O. Smith Corporation (Smith), which manufactures and sells a similar water heater under its LIME TAMER mark. The patent in suit is for a water heater designed to reduce sediment buildup, i.e., minerals such as lime, in the water heater tank. Sediment buildup reduces efficiency and eventually may cause tank failure.

The preferred embodiment of the invention is shown in Figs. 1 and 2 of the patent, reproduced below:

Fig. 1 is a sectional elevation of the water heater and Fig. 2 is a section on the line 2–2 of Fig. 1 showing the agitator assembly mounted in the bottom portion of the tank 22. Flue tubes 20 conduct hot gas from burner 15 through the water. The agitator assembly 28 includes a ring-shaped tubular member 30 positioned in the bottom of the tank closely adjacent to its side wall 10 and a secondary tubular member 32, connected to the ring-shaped member 30, which extends horizontally toward the center of the tank. Tubular member 30 has several small holes 34 and several venturi fittings 46 all directed toward the center of the tank at a level closely adjacent to the bottom of the tank. These openings are positioned so that the streams of water flowing from them are directed over and adjacent to the bottom of the tank.

The secondary tubular member 32 has several small holes 35 and, near its inner end an upwardly directed venturi fitting 47, which enhance the desired stirring action and help suspend the sediment in the center of the tank.

Thus, when hot water is withdrawn through outlet 42 at the top of the tank, cold water simultaneously flows into, and out of the openings in, the agitator assembly. The combined action of the water flowing from the openings in that assembly stirs up and suspends sediment which has settled to the bottom of the tank and ultimately carries it upward and out through the hot water outlet 42.

The '879 patent contains eight claims of which only claims 7 and 8 are relied on. Claim 7, directed to the water heater structure, is exemplary. It reads (paragraphing added):

7. A water heater comprising:

a water tight tank means adapted to contain water under pressure;

a source of heat for heating water inside said tank means;

a hot water outlet means located in the top portion of said tank means for periodically withdrawing heated water from the top portion of said tank means;

an agitator assembly means mounted in the bottom portion of said tank, said agitator assembly means including

a tubular member connected to a source of water under pressure to be heated,

said tubular member extending into said water tight tank means,

said tubular member being imperforate other than having a plurality of small openings therein spaced along the length thereof to direct multiple streams of water under pressure into the tank each time water is drawn out of the top portion of said tank means through said hot water outlet means, said plurality of openings in said otherwise imperforate tubular member positioned so that said multiple streams of water will be directed over and adjacent to the bottom of the tank means to create a stirring action in the lower portion of said tank means to thereby cause solid materials which have either settled to the bottom or are in the process of settling to the bottom to be maintained in suspension in the water

so that ultimately at least a portion of said materials will be carried upwardly in said tank means and out said hot water outlet means,

the relationship of the aggregate size of the small openings in said otherwise imperforate tubular member to the size of said tubular member itself is such that the velocity of the water flowing into said tank means through said plurality of openings in said tubular member is greater than the velocity of water flowing into said tubular member from the source of cold water under pressure to thereby create the desired stirring action in the bottom portion of said tank means.

Claim 8 is directed to a method of heating and circulating water in the tank of claim 7.

The district court held that '879 patent valid and infringed by Smith's LIME TAMER water heater, which is illustrated in Smith's Cook patent No. 4,257,355, of which Figs. 2 and 4 are reproduced below.

Fig. 2

Fig. 4

Cold water is introduced into the tank through inlet tube 16, located in the bottom of the tank and discharging downwardly against the lower head 3 of the tank through openings 23. Fig. 4, which is an enlarged cross-section of inlet tube 16, shows the openings 23 located at about a 45° angle to the tank bottom 3. In addition, water is discharged upwardly along the central axis of the tank through a

single upwardly-facing opening 24. The holes 23 and 24 are so located as to "agitate sediment in the bottom of the tank and prevent build up of sediment deposits on the inner surface of the lower head of the tank," to quote from Smith's patent.

In reaching its determination of infringement, the district court found as fact:

44. It is the finding of this Court that the multiple streams of water flowing from the openings in the Lime Tamer inlet tube are directed over and adjacent the bottom of the tank to produce the desired stirring action as defined in claims 7 and 8 of the '879 patent-in-suit.

89. Other than for the configuration of the inlet tube, the patented Sandblaster water heater and the accused Lime Tamer water heater are very similar. They both operate in the same manner to produce the same results and thus, the Lime Tamer heater is a substantial copy of the Sandblaster heater.

With respect to the district court's holding of willful infringement it found as fact:

128. Defendant Smith, upon the appearance of the Sandblaster water heater on the market, initiated a crash program to develop a Sandblaster equivalent resulting in the manufacture and sale of the accused Lime Tamer water heater * * *. Defendant, Smith, proceeded with the manufacture and sale of the accused Lime Tamer water heater after receiving notice of infringement from State without obtaining an opinion of counsel regarding infringement or validity of the '879 patent-in-suit * * *.

Smith argues before us, as it did below, that the '879 patent is invalid under 35 U.S.C. § 102(b) because of a sale of a heater embodying the claimed invention more than one year before the filing of the application for the patent in suit, notwithstanding the holding below that the patent is entitled to the filing date of a parent application which matured into State's patent No. 4,157,077 ('077), which was within the one-year period of the statute.

## Issues on Appeal

Did the District Court err in holding:

1. The invention defined in claims 7 and 8 of the '879 patent would not have been obvious from the prior art.

2. The '879 patent is entitled to the filing date of application serial No. 854,721 (now State's '077 patent), of which it is stated to be a continuation-in-part.

3. Smith has infringed claims 7 and 8.

4. Smith's infringement was willful.

## OPINION

### 1. *Obviousness*

Smith contends that the district court incorrectly determined the scope and content of the prior art and the differences between the claimed invention and the prior art.

Our review of the trial court's fact findings mandated by 35 U.S.C. § 103, however, is limited to determining whether they were clearly erroneous in light of the evidence. *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1444, 223 USPQ 603, 606 (Fed.Cir.1984).

With respect to Smith's criticism of the district court's analysis of the prior art, Smith relies primarily on the Smith B–97 water heater, sold from 1959 to 1962, and the National Steel Construction Company (National) water heater, which were not before the Patent and Trademark Office during prosecution of the application for the '879 patent.

The construction of the B–97 water heater is illustrated in Smith's exhibit 106, below.

Hot Water Outlet

Bottom Head

Cold Water Inlet Tube

Bottom Head

Gas Burner

This heater has a 5⅛ inch long cold water inlet tube with 8 openings directed upward at an angle of 15° or 20°. The most inward pair of holes is only 4 inches from the tank wall.

Smith argues that the trial court ignored the testimony of its expert, Robert Cook that: "The size and position of the openings [provided] * * * agitation action to aid in dislodging and removing sediment or lime build-up on the lower head of the tank." This is simply reargument of an assertion with respect to which the district court stated, in part:

61. The inlet tube of the B–97 heater does not direct multiple streams of water over and adjacent the bottom of the tank to create a stirring action in the lower portion of the tank to thereby prevent sediment build-up across the bottom of the tank. Because the B–97 inlet tube extends into the tank only 5⅛ inches in a 20 in. or a 24 in. internal diameter tank, there could be little or no agitation of sediment beyond the end of the 5⅛ in. inlet tube * * *. Also because the total size of the upwardly directed openings in the tube was approximately equal to or greater than the size of the tube itself, the velocity of the streams of water coming out of the openings would be low, i.e., the velocity of the streams would be approximately equal to or less than the velocity of water flowing through the tube itself.

We are unpersuaded by Smith that the trial court was clearly erroneous in its findings regarding the B–97 heater.

The National water heater is shown in the sketch below:

Hot Water Outlet

Electrical Heating Elements

Cold Water Inlet Tube

It is an electric heater having a horizontal tank and a cold water inlet referred to as a "diffusing pipe" with openings directed *upward* at an angle of 45°.

Smith argues:

> The significance of the National heater is that it shows the concept of introducing cold water through a perforated, closed-end inlet tube simultaneously with the withdrawal of hot water, with the cold water being discharged through a plurality of holes toward the area of the tank where harmful lime buildup can occur i.e. *on the heating elements* in an electrical heater. [Emphasis ours.]

To the contrary, Mr. Dirk Eisinga, president of National when the National heater in question was developed, who supervised the design and development of the National heater, testified:

> The stirring action is what we were trying to avoid. We tried to minimize it to whatever extent we could by reducing the velocity. I'm sure there was some stirring action but the purpose was to eliminate it.

The district court apparently accepted Eisinga's testimony, finding as fact:

> 67. The purpose of the diffusing pipes in the National Steel water heater is to bring the incoming water in very slowly and gently and to spread it out over the entire bottom of the tank to thereby prevent excessive mixing of the cold water with the previously heated water stored in the tank, i.e., the purpose was to avoid producing a stirring action as much as possible * * *.

The district court, in the best position to judge the testimony and evidence, found that the National heater taught away from the invention claimed in the '879 patent.

We are not persuaded by Smith that the district court was clearly erroneous in its evaluation of the National heater's significance.

### 2. *On Sale Bar to the '879 Patent Under § 102(b)*

▮ Appellant continues to argue that claims 7 and 8 of the '879 patent are invalid under 35 U.S.C. § 102(b) because of a sale more than a year before the U.S. patent application was filed in this country. The '879 patent states on its face that it is a continuation-in-part of the application for U.S. patent No. 4,157,077 which issued on an application filed November 25, 1977. State is the assignee named in the '077 patent. The first sale of the SANDBLAST-ER heater encompassing the invention claimed in the '879 patent occurred in September 1977, over a year prior to the '879 patent application's filing date of February 1, 1979. Therefore, if claims 7 and 8 are to be saved from the bar, the specification of the '077 patent must contain a disclosure of the subject matter of those claims. Smith states in its reply brief:

The issue is whether the "otherwise imperforate" and "size relationship" limitations of claims 7 and 8 are supported by the disclosure of the original '077 patent. If not, the claims are invalid as a matter of law under 35 U.S.C. § 102(b).

Smith further says:

> This defense is not based on an adequacy of disclosure defense under § 112, although the two could be related. [Emphasis ours.].

We hold that Smith's assertion as to the role of 35 U.S.C. § 112 in this type of § 102(b) defense is incorrect as a matter of law.

Smith has the burden to prove that the district court was incorrect in holding that State was entitled to the benefit of its earlier filing date under 35 U.S.C. § 120, which provides in part:

> An applicant for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ... by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application .... [Emphasis ours.]

For example,

> If matter added through amendment to a C–I–P application is deemed inherent in whatever the original parent application discloses, ... that matter also is entitled to the filing date of the original, parent application. [Litton Systems, Inc. v.

Whirlpool Corp., 728 F.2d 1423, 1438, 221 USPQ 97, 106 (Fed.Cir.1984).]

Therefore, to prevail, Smith must prove that the newly added matter in the C–I–P application was not adequately disclosed in the earlier application in the manner required by the first paragraph of § 112. Pennwalt Corp. v. Akzona Inc., 740 F.2d 1573, 1578, 222 USPQ 833, 836 (Fed.Cir. 1984).* We find Smith's argument unpersuasive and decline to reverse the district court's reasoned analysis which fully analyzes the facts and holds claims 7 and 8 supported in the parent application.

### Infringement

■ The parties agree that infringement hinges on whether Smith's LIME TAMER water heater openings in the water inlet tube are positioned so that "multiple streams of water will be directed over and adjacent the bottom of the tank," as recited in the claims in suit.

Smith argues that "the incoming water is directed downwardly at an angle of about 45° to the horizontal, as well as being discharged vertically upward through a single outlet. The incoming water in the LIME TAMER heater which is directed downwardly, impinges or blasts directly on the lower head of the water heater to scrub the bottom of the tank." In summary, Smith contends that since its heater directs water "downwardly" instead of "over and adjacent," its structure is sufficiently distinguishable from the language of the claims, so as to preclude infringement.

---

* Litton and Pennwalt are factually very different from the instant case. In both cases, this court held that the patentee was estopped by acquiescence from arguing whether the new matter contained in the C–I–P was adequately supported in the parent, according to the first paragraph of § 112.

In Litton, there was a PTO new matter rejection, based on words added in a 37 CFR 1.60 application, which prompted the C–I–P application. This court held that the patentee, without a written statement in the record pursuant to 37 CFR 1.133, was estopped from arguing that the C–I–P application, filed in response to the new matter rejection, did not contain new matter.

Similarly, in Pennwalt, the patentee, in response to a § 112, first paragraph, rejection,

filed the parent C–I–P application and abandoned the grandparent application. This court held that the filing of a C–I–P application in response to a § 112 rejection is prima facie evidence of acquiescence in the PTO's rejections, but that did not preclude the patentee from going forward with evidence to show that it did not acquiesce. This court went on to hold that the patentee failed to present evidence that it did not acquiesce, and therefore, because estoppel applied, it was unnecessary to determine the sufficiency of the grandparent disclosure.

Here, unlike Litton and Pennwalt, there was no PTO rejection prompting the C–I–P; rather, State filed the C–I–P to broaden its claims to better cover Smith's allegedly infringing device.

In considering this identical argument, the district court found as fact:

129. Defendant Smith's position regarding infringement is untenable. The Sandblaster and Lime Tamer water heaters operate in the same manner to produce the same result. Smith's expert, Robert E. Cook, acknowledged that the streams emanating from the Lime Tamer inlet tube "scrub" the bottom of the tank and "boil over" the bottom of the tank. This is tantamount to acknowledging that the streams are directed over and adjacent the bottom of the tank as specified in the claims.

And it made the following "conclusion of law":

54. * * * Smith's contention that the Lime Tamer heater does not infringe the claims in issue because it does not direct the streams "over and adjacent to the bottom of the tank means" defies basic fundamentals of fluid flow and, consequently, is totally lacking in merit.

Smith, repeating its trial court contention, has failed to show this court *why* the district court was clearly erroneous in finding that Smith's water heater directs its cold water streams "over and adjacent" the bottom of the tank.

Having carefully considered appellant's arguments on the infringement issue, we find no reason to disturb the district court's well-supported decision thereon.

### 4. *Willful Infringement and Trebled Damages*

■ We find State's case for willful infringement, on which it persuaded the district court to adopt its proposed findings of fact and conclusions of law verbatim, to be fatally flawed as based on a mixture of fact with non-fact and erroneous legal presumptions. For purposes of discussion, it is essential first to review the chronology of undisputed events related to the development of Smith's LIME TAMER heater and to State's acquisition of patent rights.

November 25, 1977, John R. Lindahl (assignor to State) filed his first patent application on State's SANDBLASTER HEATER, serial No. 854,721, containing disclosure which has been found to support the claims in suit. It was, of course, maintained in secrecy by the Patent and Trademark Office (PTO) until June 5, 1979, when it matured into patent '077. All claims of that patent are limited to a *ring-shaped* water-inlet pipe, or "agitator," and have never been asserted against Smith whose "agitator" is not ring shaped.

Prior to August 1, 1978, State introduced to the market its SANDBLASTER heater (first sale stipulated to have been September 12, 1977) with accompanying literature which stated, among other things, by way of the not uncommon footnote statement, "Patent Applied For." This was referenced by the asterisk in the following statement:

New exclusive feature * of Sandblaster water heater reduces build-up of sand, lime and sediment.

This was the totality of Smith's information on any "patent position" by State on the invention at bar until the commencement of this suit. It was aware only of that notice, not of any patent application.

Smith, being a longtime competitor of State's in the water-heater business, of course became aware of the SANDBLASTER and on August 1, 1978, Smith's general product manager sent an internal memo to certain company personnel stating:

The feature described in the attached State literature "could" have serious implications relative to our commercial water heater warranty administration. Thus, we have asked R.C. Anderson to purchase a heater for our evaluation.

That SANDBLASTER heater was obtained sometime prior to October 5, 1978, and, it hardly need be said, was carefully examined and tested.

In the full flush of competitive spirit, Smith then proceeded to design, test, and market its LIME TAMER heater, the designer being Robert E. Cook, Director of Product Engineering and Development in the A.O. Smith Company, also one of its expert witnesses in this litigation.

State repeatedly asserts, and persuaded the district court to hold, in effect, that Smith "copied" the SANDBLASTER heater. Attention is directed, however, to the early part of this opinion describing the two heaters and illustrating the substantial and apparent differences in the structures of the water inlet plumbing. They show that Smith clearly *did not copy* State's water inlet structure, but devised its own quite different structure. Instead of the Lindahl "agitator assembly" (see claim 8, supra) consisting of a circular inlet pipe containing *horizontally-directed* openings and venturi nozzles plus a single radial pipe going to the center of the tank with more of the same, as in the SANDBLASTER put on the market, Smith's LIME TAMER has one *straight* water inlet tube with a plurality of orifices directed *angularly downward* and a single orifice directed upward in the center of the tank.

While justifiably denying copying, Smith candidly concedes in its brief before us that "the appearance of the plaintiff's Sandblaster heater on the market spurred the defendant, Smith, into activity to design a competing product." Having designed its own product, Smith proceeded through its outside patent counsel to obtain advice on its possible patentability, filed an application, and eventually obtained a patent (Cook patent No. 4,257,355)—facts which State attempts to turn to its own benefit in various ways but which we consider wholly irrelevant to the issue of willful infringement under discussion.

February 1, 1979, Lindahl filed another patent application, serial No. 8,275, which, as filed, stated that "This invention is an improvement in the invention described and claimed in" his November 25, 1977, application. The "improvement" was the upwardly directed venturi 47 on pipe 32 to which all claims of patent '879 except the two in suit are specifically limited. This is the application that matured into the patent in suit. It was stipulated in a pretrial order that, *as filed,* all claims of this second application were also limited to a ring-shaped agitator assembly. It was further stipulated that on July 30, 1979, represent-atives of State inspected an A.O. Smith LIME TAMER heater following which claims *not* limited to a ring-shaped agitator were first introduced into application 8,275. A more detailed statement about this appears in an amendment to that second application dated November 19, 1979, when the application was amended to state that it was a continuation-in-part of the November 25, 1977 application, in order to get that filing date under 35 U.S.C. § 120, *and to add broader claims.* We quote the attorney's "Remarks" accompanying the amendment:

> The addition of new Claims 7–10 was prompted by an inspection on July 30, 1979 by Applicant's attorney of a water heater manufactured by a competitor of Applicant's assignee. Such competitor's water heater employed an agitator assembly which was comprised solely of a single straight tube portion 32 of the present invention.

The departure of that statement from fact is apparent. Smith's inlet pipe or agitator is not "the straight tube portion 32 of the [Lindahl] invention" the openings in which are horizontally directed, whereas Smith's are directed angularly downward. Claims 7–10 submitted that day are all marked as cancelled by a later amendment "D", but the applicant was on his way to getting the claims in suit, expressly drafted to cover the LIME TAMER heater after it had been inspected. Thus, we see the familiar picture of competitors competing, one trying to match a new product of the other with a new product of its own, *not copied* but doing the same job, and the other manipulating its secret pending patent application to cover the functionally competitive structure it did *not* think of but deems to embody its proprietary "inventive concept." This is a classic commercial gamesmanship under the patent system but it is not the kind of behavior courts have categorized in the past as *willful infringement,* which requires knowledge of the patent.

Conduct such as Smith's, involving keeping track of a competitor's products and designing new and possibly better or

cheaper functional equivalents is the stuff of which competition is made and is supposed to benefit the consumer. One of the benefits of a patent system is its so-called "negative incentive" to "design around" a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace. It should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them. The world of competition is full of "fair fights," of which this suit seems to be one.

To conclude the chronology of events, the lower court found as a fact that Smith's LIME TAMER heater was put on the market in April of 1981, and the parties agree about that. (The joint appendix and briefs before us do not disclose how State's attorney got to see it a year and nine months earlier except that the heater was "on test in Texas.") April 28, 1981, the patent in suit issued and this suit was commenced 22 days later on May 20, 1981.

It was stipulated in the pretrial order that "The plaintiff did not notify the defendant of the alleged infringement of patent 4,263,879 [in suit] prior to filing the complaint in the present action."

It bears repeating that it was not until November 19, 1979, that State commenced its efforts in the PTO to obtain claims which would *cover* the agitator structure in the LIME TAMER, which structure it did not invent or disclose in either of its patents, that its patent containing those claims issued April 28, 1981, *after* the LIME TAMER had been placed on the market, and that the LIME TAMER had been designed and built and was being tested before the progenitors of claims 7 and 8 in suit were submitted to the PTO, Smith being in the dark about State's patent application prosecution activity and knowing nothing about State's patent until it was sued.

■ Against this factual background, we are constrained to agree with Smith that there can be no "willful infringement." To willfully infringe *a patent*, the patent must exist and one must have knowledge of it. A "patent pending" notice gives one no

knowledge whatsoever. It is not even a guarantee that an application has been filed. Filing an application is no guarantee any patent will issue and a very substantial percentage of applications never result in patents. What the scope of claims in patents that do issue will be is something totally unforeseeable.

We have carefully considered the arguments in State's brief and find them totally unpersuasive and sometimes incomprehensible. For example, it asserts that Smith "never sought the opinion of counsel regarding infringement or validity of the '879 patent-in-suit," although it stipulated that it never gave Smith notice of the patent before suit and well knowing that suit was commenced within 22 days of the issue of that patent. Surely, once suit was commenced Smith took counsel and this suit manifests substantial and close questions on both validity and infringement. We turn now to some specific points on which the trial court erred.

After adopting a number of proposed Conclusions of Law which correctly analyze the case law on willfulness, the trial judge adopted Conclusion of Law 54 stating that the record supports "a conclusion that all the essential elements of State's Sandblaster water heater had been faithfully imitated by Smith in constructing its Lime Tamer water heater." We find this statement to be clearly contrary to the evidence. It may be noted that the two competitors' water heaters have, indeed, many *elements* in common, and common to the art as well—tanks, heaters, flues, inlets, and outlets—but the only *novel* parts of the structure contributed by Lindahl, the agitator plumbing, were not "faithfully imitated" by Smith. The first patent issued on Lindahl's invention ('077), as noted above, was never asserted against it. Nor were claims 1–6 in the patent in suit ('879) infringed, they being the claims which describe the "improvement" Lindahl subsequently made to the SANDBLASTER and for which he filed the second application, only later denominated a continuation-in-part in order to provide a legally sound

base on which to rest the two claims in suit which were carefully phrased to read on the LIME TAMER. This was a legitimate maneuver but, as Smith points out, it constituted "willful" behavior on State's part, clearly the result of competition-stimulated hindsight.

Another statement in Conclusion 54 is that "Smith started manufacturing and selling its Lime Tamer heater *and continued to do so* after receiving notice of infringement without seeking the advice of a patent attorney." (Emphasis added.) One must split this double statement into its two components, because it is a bit of double-talk. If the conjunctive phrase "and continued to do so" is deleted, the statement is wholly contrary to fact since the LIME TAMER was made and tested in Texas and inspected by State's attorney in July of 1979 and Smith, it was stipulated, got its first notice of alleged infringement by the complaint filed in this action in May of 1981. The aforesaid conjunctive phrase refers, of course, only to what has occurred during this lawsuit, during which Smith has been amply supplied with the "advice of a patent attorney" who hoped, with considerable justification, to prevail on at least one of several issues, making his client's actions far from wanton, reckless, or in deliberate disregard for State's rights. *Aerosol Research Co. v. Scovill Mfg. Co.*, 334 F.2d 751, 758, 141 USPQ 758, 764 (7th Cir.1964). Indeed, at this point he may still be hoping, for this decision is not the absolute end of the road.

What we have just said applies equally to Conclusion of Law 55, another double-barrelled statement reading, in conclusion:

55. The totality of Smith's conduct, prior to and during this suit, demonstrates a willful, deliberate and flagrant disregard of State's patent rights and lack of good faith and, therefore, justifies a trebling of damages under 35 U.S.C. § 284.

We have to disagree. We can understand that the statement could be drafted by an enthusiastic winning plaintiff's counsel but the record in this case simply does not justify its adoption by the trial judge, for reasons we have stated above. Until 22 days before suit, State did not *have* the patent in suit, although for a couple of years it had had the *uninfringed* '077 patent on the same heater. Until State got the '879 patent, 22 days before suit, Smith had a perfect right to make and sell its LIME TAMER, without question, because State had no "patent rights" which covered it. *Aerosol*, 334 F.2d at 758, 141 USPQ at 764. A patent has no retroactive effect. 35 U.S.C. § 271(a).

Since we have been unable to discern any justification for holding Smith's defenses against the patent in suit to have been frivolous, on either the issue of validity or the issue of infringement, we do not perceive any lack of "good faith" in defending the suit and therefore we do not feel that what Smith had been doing while the suit was in progress is to be given any weight in determining "willfulness."

This court, in discussing the willfulness issue in the context of awarding attorney fees, recently said in *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565, 219 USPQ 377, 388 (Fed.Cir.1983),

With respect to the court's finding of deliberate and willful infringement, more is necessary to support a finding of "willfulness" than that the infringing acts were not inadvertent. The court must determine that the infringer acted in disregard *of the patent*, that is, that the infringer had no reasonable basis for believing it had a right to do the acts. [Emphasis added.]

State, in its brief, relies on two recent cases in this court, *Central Soya Co. v. George A. Hormel & Co.*, 723 F.2d 1573, 220 USPQ 490 (Fed.Cir.1983), and *Underwater Devices v. Morrison-Knudsen*, 717 F.2d 1380, 219 USPQ 569 (Fed.Cir.1983). We distinguish them on their facts. In *Central Soya*, the plaintiff's patent had issued before the infringement was commenced with the aid of a plaintiff's employee hired away by the defendant. In determining willfulness, we said "It is necessary to look at 'the totality of circumstances

presented in the case' * * *.'' Patent counsel had been consulted and gave two opinions: (1) there was a reasonable chance the patent could be held invalid; (2) infringement could be avoided by following certain procedures which the defendant, for a long time thereafter, took no pains to follow. In *Underwater Devices*, the infringer had actual notice of plaintiff's patent rights before the infringement began. The notice was by letter offering a license under the patent before any infringement took place and defendant chose to proceed without a license. We affirmed the district court's finding of willful infringement, saying:

> Moreover, M–K did not receive the opinion of its patent counsel until * * * after the infringement had commenced and even after the complaint for the instant case was filed. [717 F.2d at 1390, 219 USPQ at 576.]

After the oral hearing in the case at bar, counsel for State called our attention by letter to a third case, which had been cited in our opinions in both of the above cases, *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 665, 206 USPQ 481, 498 (10th Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Looking at the "totality of circumstances" in that case and comparing it with the facts here, we distinguish it also on its facts. Although the patents had not issued in *Milgo* before the copying began, the distinction is that in *Milgo* there was a most elaborate and detailed copying ("slavish copying" according to the trial judge) of complex electronic circuitry in a "modem" by a corps of engineers working in secrecy over a period of a couple of years to pry loose the secret of Milgo's inventions (623 F.2d at 652, 206 USPQ at 486). Because, as explained above, Smith did not copy State's structure, the fact situations are quite different. *Milgo* is not a compelling precedent.

For the foregoing reasons, we reverse the holding below that infringement was willful, etc., as stated in Conclusion 55. This removes the court's only asserted basis for exercising its discretion under § 284 to treble damages, which is, therefore, also reversed.

### Attorney Fees

 The district court's award of attorney fees was contained in its Conclusion of Law 56, as follows:

> 56. For the same reasons, this is an exceptional case justifying an award of reasonable attorneys' fees to State within the meaning of 35 U.S.C. § 285.

The "same reasons" being those given for finding infringement to have been willful, which we have reversed as without support in the record, we disapprove that ground for holding this case to be exceptional within the meaning of § 285 and reverse the award.

When the patent statutes were first amended to provide for the discretionary award of attorney fees in 1946, the legislative history made it clear that their award was not to be an ordinary thing. The courts so construed it in the years following until the 1952 patent act made it specific by specifying in § 285 that the court's discretion was limited to awarding them "in exceptional cases." *Rohm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688, 691, 222 USPQ 97, 99 (Fed.Cir.1984). *See* 8 *Deller's Walker on Patents* § 760 (2d Ed. 1973); D. Chisum, *Patents* § 20.03[4][c] (1981). Merely losing on the defenses of invalidity and non-infringement is not enough to make a case exceptional. As this case now stands, we see no ground on which to hold that it is exceptional.

### CONCLUSION

The district court's holding that infringement was willful, its trebling of damages, and its award of attorney fees to the plaintiff State Industries, Inc. are *reversed* and its Order of October 5, 1983, is otherwise *affirmed.*

Each party shall bear its own costs on appeal.

AFFIRMED IN PART and REVERSED IN PART.